**Opinion filed September 22, 2022**



In The

# Eleventh Court of Appeals

_____

## No. 11-21-00031-CR

_____

**JACOB UNGER NEUFELD, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 106th District Court**

**Gaines County, Texas**

**Trial Court Cause No. 19-5020**

## M E M O R A N D U M   O P I N I O N

The State charged Appellant, Jacob Unger Neufeld, by indictment with one count of first-degree murder. *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2019). The State alleged in the indictment that Appellant intentionally or knowingly caused the death of his wife, Susana Neufeld, by shooting her with a firearm. The jury convicted Appellant of first-degree murder and assessed his punishment at confinement for a term of life in the Institutional Division of the Texas Department

of Criminal Justice and a fine of $10,000. In his sole issue, Appellant challenges the sufficiency of the evidence to support his conviction. He requests that we reverse his conviction for first-degree murder, acquit him of that charge, and then convict him of the lesser-included offense of manslaughter. We affirm.

*Background Facts*

At trial, the State called Susana's family members to provide testimony about the violent nature of her relationship with Appellant. Throughout their testimony, a few common themes emerged—namely, that Appellant became angry when drinking alcohol, that Appellant had threatened Susana multiple times with a firearm, and that Susana feared that Appellant would kill her.

Susana's father, John Peters, testified that Susana and Appellant had been married for almost twenty years at the time of Susana's death. Appellant and Susana had seven children together, ranging from the age of six or seven to twenty-three at the time of Appellant's trial. The family lived in a home on the outskirts of Seminole.

One of the Neufelds' sons, K.N., was sixteen years old at the time of trial. He described Susana as "very peaceful and loving." One of the Neufelds' daughters, D.N., was fourteen years old at the time of trial. She described a normal day in her mother's life to start with making breakfast and getting the kids ready for school. D.N. testified that her mother took "good care" of the family.

D.N. said that when her father drank too much alcohol, "he was a little bit angry with -- I don't know what. Maybe the world." Sara Peters, one of Susana's sisters, recalled several conversations with Susana in which Susana disclosed that Appellant would be "drunk and enraged," including an incident where Appellant set a car on fire and began shooting at it, causing Susana to fear that Appellant would turn and shoot her.

Martha Hamm, another one of Susana's sisters, testified that she once allowed Susana and the Neufeld children to stay with her and her family because Susana told Martha that Appellant had gotten angry and squeezed the breath out of the Neufelds' infant child. Appellant later showed up at the Hamm household in Kansas, saying that he "wanted [them] to know that [he] could find anybody anywhere."

Several witnesses testified to previous incidents of Appellant being violent in the home. Thomas Neufeld, Appellant and Susana's twenty-year-old son, recalled Appellant threatening him with a firearm because Appellant was upset that Thomas was thinking of joining the military. K.N. recalled an incident that occurred when he was five or six years old when Appellant threatened Susana with a "single barrel crack barrel twelve-gauge shotgun." K.N. saw his mother "pleading" with his father and watched his mother eventually escape into the closet of the bedroom K.N. shared with his brothers to call the police. K.N. remembered seeing the police arrive at the house and take Appellant away. D.N. testified that she also remembered the police coming to her house when she was three or four years old and recalled seeing blood on the ground.

Lena Peters, Susana's sister-in-law, recalled Susana telling her that Appellant would blast loud music so the kids could not hear what was happening and use a firearm to threaten and scare Susana. Sara remembered Susana confiding in her about an incident that happened around Christmas of 2018 where Appellant held a firearm to Susana's head for several hours during the night, threatening to pull the trigger if Susana moved.

Martha recalled Susana telling her that Appellant warned Susana that "he was very scared that one day when he would pull a gun on her that he would actually shoot her." Susana once told Martha, "It's sad to say, but you can get used to feeling the gun on the back of your head."

Sara testified that Susana made comments about how "her days were numbered" and that "it wouldn't matter if [Susana] left. [Appellant would] hunt [Susana] down, and he'd kill [her] anyway." Martha testified that Appellant told Susana he would take the family to Mexico, kill Susana, and hide her body. Sara and Lena also testified that Appellant would threaten to take Susana on a trip and leave her body where it would never be found.

Appellant also presented witnesses to testify about the family dynamic: his two brothers, Henry and Abe Neufeld, and his oldest son, Justin Neufeld. Henry characterized Appellant and Susana's relationship as "very happy and joking," and Henry testified that he had never noticed any problems between them. He had never seen Appellant physically abuse Susana. Similarly, Abe described the relationship as "pretty good" and testified that he had never seen Appellant physically abuse Susana.

Justin testified that he did not remember ever seeing his father physically abuse his mother, nor could he recall seeing his father ever point a firearm at his mother. However, Justin's testimony later revealed instances of violence that he remembered. He recalled living with his aunt and uncle when he was sixteen or seventeen years old after Appellant threatened Susana. He also remembered an incident when he was around ten involving Susana calling the police after Appellant had threatened Justin's grandparents with a firearm after he had been drinking. Justin testified that Appellant's relationship with Susana would change when he drank alcohol and that Appellant was easily angered when drinking.

Sara spoke to Susana in the afternoon of February 23, 2019, the day of Susana's murder. Susana told Sara that "[s]he was lonely, and she was scared. She knew that when [Appellant] would come home[,] he'd be drunk, and it would just be a routine of Saturday nights, violence and drunkenness and possibly the gun to her head again threatening her life."

4

On February 23, K.N. noticed that Appellant came home drunk. K.N. testified that Appellant had been gone for most of the day and arrived home around 8:30 or 8:45 p.m. Appellant had spent the day drinking with his brother, Henry. Henry estimated that Appellant drank about twelve beers that day. Henry testified that when he spoke with Appellant in Appellant's driveway after driving him home, they made plans to have a barbecue at Henry's house. Henry said that Appellant was "all happy" and "there was absolutely nothing wrong." Henry did not recall Appellant seeming to be angry or upset with Susana.

K.N., however, had an "uneasy feeling" when his father arrived. K.N. watched as Appellant paced back and forth in the house and as Appellant eventually displayed a Hi-Point .40 caliber firearm. K.N. then heard his father "rack" the firearm[1] and tell Susana to unlock the car. K.N. listened as his mother "pleaded with [Appellant], 'please don't hurt me.'" K.N. testified that Susana told Appellant she would get the keys but that Appellant replied, "No you won't. Go outside." K.N. listened as Susana "continued to plead with him not to hurt her." Susana "was standing with her hands up." K.N. watched as his father, with a firearm pointed at his mother's face, backed his mother out the door. The next thing K.N. heard was "five or six" gunshots. D.N. corroborated this testimony—she was playing a game with her sisters when Appellant arrived home. She testified that she remembered hearing about six gunshots.

After the gunshots, K.N.'s father "came inside and . . . told [K.N.], 'Your mom is dead.'" After telling K.N.'s sisters what had happened, Appellant began pacing again, repeating: "This was not supposed to happen." K.N.'s sister asked Appellant where he had shot her mother. Appellant responded, "In the face." D.N.

---

[1]K.N. clarified that racking the gun meant that Appellant pulled the slide back on it to chamber a round into the barrel.

recalled Appellant saying to his children, "You know I'm going to have to go to prison for this."

John lived about 600 feet from the Neufelds at the time of the incident. John testified that it was not uncommon to hear gunshots coming from Appellant and Susana's house because they often shot targets, stray dogs, and rabbits. John testified that, on February 23, he heard four gunshots in quick succession, followed by another shot a moment later that "had a different sound than the first four."

John said that Appellant came into John's house and said that "Susana was dead, that he shot her." John was not sure whether the shooting was an accident. John did not remember Appellant crying, and he described Appellant's behavior as "part normal."

John and his wife got into their vehicle and followed Appellant back to Appellant's house. John called 9-1-1. John saw that Susana had multiple gunshot wounds. Susana's autopsy revealed that she had a total of three gunshot wounds: one in her left hand, one graze wound on her shoulder, and one wound with an entrance point at her left cheek and an exit wound on the right side of her neck.

Dispatcher Daniel Alaniz received a 9-1-1 call from Appellant on the night of February 23, regarding a shooting. Alaniz asked the caller several times where he put the firearm, but he never received an answer. Alaniz read a portion of the call report into evidence, which read in part: "Caller advised that he made a bad decision. He advised that he shot his wife by accident and was needing the officers to know it was an accident. Caller advised he did not know she was going to be there and then replied, 'She is dead.'"

Deputy Victor Montez arrived on scene and made contact with Appellant and John. Appellant was kneeling next to Susana on the ground, and Deputy Montez asked Appellant if Susana had a pulse. Appellant did not respond. At first, Deputy Montez believed Appellant was a bystander due to his "calm" and "absolutely

6

collected" demeanor. When Deputy Montez spoke with Appellant, he kept repeating, "It was an accident," and began backing away, causing Deputy Montez to become suspicious and detain Appellant.

Texas Ranger Terry Eaton was called to the scene to assist in the investigation of the case. Ranger Eaton photographed the crime scene and marked evidence at the scene. Ranger Eaton testified that the magazine found close to the firearm Appellant used was empty. Ranger Eaton also testified that he found six shell casings. Ranger Eaton described the casings as "shiny" and "not tarnished," indicating that the shells were "fresh." Ranger Eaton also testified that the Lincoln Navigator at the scene had a "bullet defect" in the side and a window "blown out." Ranger Eaton said that he knew the window of the Navigator had been recently broken since the glass was still in the driveway. Ranger Eaton testified that the bullet defect in the Navigator was newly made since the paint was recently chipped and the underlying metal was not rusted.

Texas Ranger Robert L. Losoya was called to the scene to take a Leica scan of the crime scene, which allowed him to obtain measurements of objects and 3D images of the crime scene. Ranger Losoya testified that the shell casing marked in evidence as "C" was about seven feet from Susana's body. Shell casings "D" and "E" were twenty-two and twenty-five feet from Susana's body, respectively. Shell casings "F," "G," and "H" were all five-to-seven feet from the threshold of the front door.

Ranger Eaton was present when Appellant was interviewed. Ranger Eaton described Appellant as "distraught" and "evasive." He testified that he believed Appellant was trying to cry but was unable to. Appellant told Ranger Eaton that he had taken Susana outside to the vehicle, shot her, and then went back into the house. Appellant did not know how many times he fired the firearm.

7

Ranger Eaton read Appellant's written statement into evidence. Appellant stated that Susana came outside and that Appellant asked her if she wanted to go to a barbecue at his brother's home. Appellant then said:

> I guess by my excitement I took out . . . my gun and I accidentally shot her. I shot her because she has a little thing about not being out too late on Saturday and my brother's place takes a little longer to get to. . . . I don't remember exactly what she said that made me shoot her, but she has her words. I didn't mean it. It started because of the alcohol. I just want to say I'm sorry. The damage is done. I took someone's life, an innocent life. There's no reason for me to run.

Chief Deputy Clint Low testified that, in his training and experience, when a person points a firearm at another and pulls the trigger, it is "not an accident." Ranger Eaton remembered Appellant telling him several times throughout the interview that the shooting "wasn't supposed to happen" and that it was an accident. Chief Deputy Low also recalled Appellant stating several times that the shooting was an accident.

Appellant made inconsistent statements throughout the two interviews that were admitted into evidence. Appellant told Ranger Eaton that Appellant did not "know if there was a good enough reason to shoot [Susana]" because "[s]he didn't do anything wrong" and that he "guess[ed] [he] was mad at her." Appellant also stated that something Susana said triggered him, and then he shot her. At one point, Appellant told Ranger Eaton, "It doesn't really matter. I'm already guilty of murder." When Lena visited Appellant in jail and asked Appellant about the killing, Appellant told her, "You don't know what she did," and "She had it coming."

*Analysis*

In his sole issue, Appellant challenges the sufficiency of the evidence supporting his conviction. Specifically, he contends that "Appellant killed Susana,

8

his wife, by accident and the evidence is legally insufficient to show that Appellant killed Susana with the intent as required by statute."

We review a challenge to the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

When conducting a sufficiency review, we consider all the evidence admitted at trial, including pieces of evidence that may have been improperly admitted. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. TEX. CODE CRIM. PROC. ANN. art. 38.04 (West 1979); *Brooks*, 323 S.W.3d at 899. This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778. When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict and defer to that determination. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778.

It is not necessary that the evidence directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence can alone be sufficient to establish guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). Each fact need not

point directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction. *Hooper*, 214 S.W.3d at 13. Because evidence must be considered cumulatively, appellate courts are not permitted to use a "divide and conquer" strategy for evaluating the sufficiency of the evidence. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015). Instead, appellate courts must consider the cumulative force of all the evidence. *Villa v. State*, 514, S.W.3d 227, 232 (Tex. Crim. App. 2017).

As charged in this case, a person commits the offense of first-degree murder if he intentionally or knowingly causes the death of an individual. PENAL § 19.02(b)(1). "[A] conviction under Section 19.02(b)(1) requires an intent to cause death." *Walter v. State*, 581 S.W.3d 957, 970 (Tex. App.—Eastland 2019, pet. ref'd). A person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result. PENAL § 6.03(a) (West 2021).

Mental culpability is a question of fact to be determined by the jury from all the facts and circumstances. *Walter*, 581 S.W.3d at 972–73. Because it is impossible to read the mind of the accused, proof of a culpable mental state is inferred from the circumstances surrounding a defendant's "acts, words, and conduct." *Nisbett v. State*, 552 S.W.3d 244, 267 (Tex. Crim. App. 2018) (quoting *Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991)).

Therefore, we look to events occurring before, during, and after the offense. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004); *Walter*, 581 S.W.3d at 975. A defendant's motive, any attempts to conceal the body, inconsistent statements or improbable explanations to law enforcement, and the extent of the victim's injuries are circumstantial evidence from which a jury can infer a defendant's intent. *Nisbett*, 552 S.W.3d at 267. Further, the specific intent to cause death can be inferred from the use of a deadly weapon, such as the firearm used here.

*Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996); *see* PENAL § 1.07(a)(17)(A) (defining a firearm as a per se deadly weapon).

Here, the jury could have reasonably inferred from the overwhelming circumstantial evidence that Appellant possessed the requisite intent to kill Susana. We first note that Appellant fired multiple shots and that he shot Susana three times. Shooting a person with a firearm multiple times is inconsistent with a claim that killing the victim was accidental. Even though Appellant maintained throughout the investigation that the shooting was an accident, we assume that the jury resolved the conflicting evidence in the State's favor. Therefore, the jury's apparent decision to believe the testimony that K.N. and D.N. gave about the murder and some of Appellant's statements—over his conflicting claims that the shooting was accidental—constitutes a credibility determination to which we defer to the jury to resolve. *See Brooks*, 323 S.W.3d at 899.

Furthermore, Appellant's conduct prior to Susana's murder provides substantial circumstantial evidence of intent. Appellant told Susana numerous times that he would take her on a trip and leave her body where it would never be found. Appellant expressed to Susana that he was worried that one day he would pull the trigger when holding a firearm to her head because the way she talked to him "was so disrespectful." K.N. remembered seeing Appellant threaten Susana with a shotgun when K.N. was no more than six years old. Around Christmas of 2018, two months before Appellant shot Susana, Appellant held a firearm to Susana's head for "several hours" and threatened to pull the trigger if Susana moved. Several witnesses also testified that Appellant became angry when he drank alcohol. K.N. testified that Appellant came home drunk the evening of the murder. Henry testified that Appellant drank about twelve beers the day of the murder.

Further, the testimony regarding Appellant's behavior at the time of the murder is additional circumstantial evidence from which the jury could infer intent.

11

Testimony was presented to the jury that, right before the murder, Appellant backed Susana out of the house at gunpoint. Susana, standing with her hands up, pleaded with Appellant to not hurt her. Afterwards, Appellant told K.N., D.N., their brothers and sisters, and John that Susana was dead because Appellant shot her.

Regarding Appellant's conduct immediately after the murder, John remembered Appellant acting "normal" and not crying. Deputy Montez testified that Appellant was "calm" and "absolutely collected." Appellant would not tell the 9-1-1 dispatcher where the firearm was. Ranger Eaton described Appellant as "evasive" during his interview. Appellant told Ranger Eaton that he did not know how many times he had fired the firearm. Appellant's written statement read in part, "I don't remember exactly what she said that made me shoot her, but she has her words." Based on Appellant's calm demeanor and evasive behavior, a rational jury could have inferred intent beyond a reasonable doubt. *See Nisbett*, 552 S.W.3d at 267.

Finally, a jury could have readily inferred Appellant's intent to kill Susana from the inconsistent statements and remarks made by him after the murder. Although Appellant claimed the shooting was an accident, he also stated that something Susana said triggered him, and then he shot her. Appellant also told Ranger Eaton that Appellant shot Susana because he "guess[ed] [he] was mad at her." Appellant told Lena that she "didn't know what [Susana] did" and that Susana "had it coming." Appellant also declared that he was "already guilty of murder." *See Nisbett*, 552 S.W.3d at 267.

Viewing the evidence in the light most favorable to the jury's verdict, we conclude that a rational jury could have determined that Appellant intended to kill Susana as charged in the indictment. *See Jackson*, 443 U.S. at 319. We overrule Appellant's sole issue on appeal.

12

*This Court's Ruling*

We affirm the judgment of the trial court.


JOHN M. BAILEY

CHIEF JUSTICE


September 22, 2022

Do not publish.  *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.